Quinlan. J.
The plaintiff Paul W. Tyler brings this action against the defendant Safety Insurance Company alleging Safety engaged in unfair claim settlement practices in violation of G.L.c. 176D and G.L.c. 93A. The matter was tried without a jury.

Findings of Fact

Based upon the credible evidence and inferences drawn therefrom, the court makes the following findings of fact.
On November 10, 1998 at approximately 3:50 p.m., there was a head-on collision on Great Road in Stow, Massachusetts. Doris C. Goldman, then aged sixty-seven, was driving her vehicle in the westbound lane when she crossed over the center line of the roadway into the oncoming lane of traffic, striking the vehicle driven by the plaintiff Paul W. Tyler, also aged sixty-seven. A third vehicle operated by Elio Nascimento was traveling behind the Tyler vehicle and hit that vehicle in the rear. Both the Tyler and Goldman vehicles were totaled. Both Mrs. Goldman and Tyler sustained serious visible injuries as a result of the collision. Mrs. Goldman was unconscious. Due to the severity of her injuries, she was air-lifted to U Mass Medical Center in Worcester. Tyler was taken to Emerson Hospital in Concord.
An eyewitness described the accident as follows: “You know how when you are following behind someone and they cross over the center line for a just second and get back in the right lane? Well, this car just kept going into the other lane. It was like a dream.” Witnesses reported the speed of the Goldman vehicle to be within the permissible limit of 35 miles per hours. The Goldman vehicle was estimated to be traveling between 30-35 miles per hour. The witnesses did not see Mrs. Goldman apply her brakes. Stow Police responding to the scene of the accident attended to the victims until medical assistance arrived, took witness statements and ultimately issued a citation to Mrs. Goldman for failure to stay to the right. The plaintiff said that before the collision he made eye contact with Mrs. Goldman.
The Goldman vehicle was insured by Safety Insurance Company. The policy number was 996171 and the bodily injury coverage was $250,000-8500,000. Safety learned of the accident within twenty-four hours. David Jaworski was assigned to investigate the claim. Jaworski reported to Stephen C. Touchette to Richard Guinan. By November 12th Safety had spoken with the investigating officer and with Ernest Goldman, Mrs. Goldman’s husband, and had obtained a copy of the police report. Safety learned that Mrs. Goldman remained in critical condition with head and *586 chest injuries and she had not regained consciousness. Mr. Goldman reported that he heard that his wife had crossed the center line and had a head-on collision with the Tyler vehicle and that the Tyler vehicle had been rear-ended by the Nascimento vehicle.
By memo dated November 25, 1998, Jaworski issued a referral memo to Guinan concerning his investigation. He characterized the issue of liability as "unfavorable” based upon his investigation, the police report, photographs of the scene and witness statements. Jaworski stated that it “appeared that most of the factual investigation has been completed . . .” Jaworski stated he would try to determine whether Mrs. Goldman had any medical condition which may have contributed to the loss. Guinan responded by memo dated December 2, 1998. He seemed to adopt Jaworski’s characterization of liability as unfavorable. In that memo to Jaworski, Guinan stated,
Why the insured operator veered into the oncoming lane needs to be addressed. When the loss occurred, the insured was returning from visiting a friend at Framingham prison. Did the visit prompt an emotional response in the insured? When Ernest Goldman stated his wife had no prior medical problems that would explain why his wife veered from her lane, did he think of every (diabetes, epilepsy, cold medicine, etc.) Please revisit this issue with the insured /her husband.
Guinan directed Jaworski to obtain authorization to obtain Mrs. Goldman’s medical records and to determine “whether there was a medical emergency which led to this loss.”
Since Mrs. Goldman remained unconscious, it was necessary to appoint a temporary guardian to handle her affairs. Mr. Goldman’s appointment as a temporary guardian was approved by the Probate and Family Court on December 28, 1998. That guardianship was ordered extended on March 23, 1999 to expire on June 22,1999.
By November 19th Jaworski had contacted and spoken with Tyler. By December 7th Safety had learned that Tyler was represented by Neil Rossman. Attorney Rossman confirmed his representation by letter dated December 10, 1998. In their early discussions, Attorney Rossman informed Jaworski that he hoped to settle this claim without the necessity of filing suit. Jaworski advised Rossman that Touchette would be the adjuster handling the claim. Touchette received Rossman’s representation letter on December 15th. Touchette responded to Rossman’s letter on December 15th, advising Rossman of the coverage limits available on the Goldman policy. In doing so, Touchette cautioned that Safety was neither admitting liability on Tyler’s claim nor waiving any terms of the policy.
By December 15, 1998, Safety was aware that Tyler’s injury to his mouth was very serious. Consequently, Touchette requested that Rossman provide copies of Tyler’s medical bills, records and reports as well as documentation of lost wages and any accident reports or photographs.
On January 13, 1999, Rossman told Touchette that he would be looking for the policy limit on behalf of Tyler and that he would be sending a package of medical records and other information concerning the Tyler claim. When asked about Tyler’s employment. Rossman was vague. In February of 1999. Touchette learned from the adjuster at Commerce Insurance[1] that Tyler was unemployed on the date of the accident and he was coming from a job interview at the time of the accident.
On February 23, 1999, Rossman sent a letter demanding Safety’s policy limit for Tyler. In that letter, Rossman noted that Tyler’s medical expenses exceeded 860,000. However, he did not enclose copies of medical or other records relating to the claim. Rather, he offered to meet with Touchette and make his file available. In the alternative, he asked Touchette to designate documents he needed to settle the claim. Touchette responded by letter dated March 2, 1999 in which he requested copies of all medical bills and records, photographs particularly of scarring, and lost wage documentation. On March 29, 1999, Rossman called Touchette, stating he wanted to discuss settlement so that he would not have to file suit. Touchette again asked for bills and further documentation on Tyler’s claim for lost earnings. Later that day, Ross-man sent a letter dated March 29, 1999 in which he repeated his demand for the full policy from Safety. He also forwarded copies of medical records and bills of Karl H. Breuing, MD, Bonnie L. Pawda, MD, Emerson Hospital, Brigham & Women’s Hospital and Tyler’s wage records from Osicom, Tyler’s resume and copies of his tax returns for 1996, 1997 and 1998. Touchette acknowledged receipt of the documents by letter dated March 30, 1999, stating he would contact Rossman after having a chance to review the same.
On April 5, 1999, Ernest Goldman called Touchette and told him he would be sending a neurologist report which included an opinion that his wife may have suffered a stroke before the accident. A copy of the report of Robin I. Davidson of the Division of Neurology for University of Massachusetts Medical Center at Worcester was sent to Touchette on April 14, 1999. The report read as follows:
Mrs. Goldman was partially under my care during December of 1998 following a head trauma from a motor vehicle accident. In addition to the head trauma, the studies suggested the possibility of her having sustained cerebral infarction or stroke and this could well have been responsible for her motor vehicle accident.
As a result of that report, Touchette again requested Mrs. Goldman’s medical records. On April 20, 1999, Touchette spoke to Rossman and advised him that he had received some medical information that Mrs. Goldman may have suffered a medical emergency *587 prior to the accident and, therefore, there may be an issue of liability. Touchette stated that he would continue his investigation into that issue and keep Ross-man advised. On May 10, 1998, Touchette received authorization for medical records of Mrs. Goldman signed by Mr. Goldman as her temporary guardian. The authorization was forwarded to Touchette by Mr. Goldman’s attorney under cover letter dated May 5, 1999. Using the authorization, Mrs. Goldman's medical records were requested.
On May 7, 1999, Rossman filed suit against Mrs. Goldman on Tyler’s behalf. On May 10, 1999, Ross-man wrote to the Goldman family advising them that he had filed suit on Tyler’s behalf because his “efforts to obtain even a minimal response from Safety Insurance has been without success.” Thereafter, by letter dated May 18, 1999, Rossman again made demand for the policy limits on Tyler’s behalf stating:
Therefore, on behalf of my client, Paul Wesley Tyler, I hereby place Safety Insurance Company on notice that its refusal to pay settlement damages for Mr. Tyler’s claimed and documented losses for personal injury, medical expense, lost wages and continuing disability and scarring as a result of the accident involving its insured, Doris C. Goldman, all as further alleged in the above referenced lawsuit . . . is without merit and constitutes an unfair and deceptive practice as set forth and codified in M.G.L. Chapters 93A and 176D.
Tyler’s demand was based upon Safety’s asserted failure to promptly investigate and settle the claim as required by G.L.c. I76D, §3(g). Safety responded by letter dated June 14, 1999 and denied violating either G.L. 93A or G.L.c. 176D. In that response, Touchette asserted that any delays in investigating the claim were, from Safety’s perspective, caused by Rossman’s failure to send requested documentation promptly upon request and further denied that liability of its insured was reasonably clear since there was an issue of sudden medical emergency which required investigation.
Attorney Lawrence F. Boyle of Morrison, Mahoney & Miller, LLP was assigned to represent Safety with respect to the Tyler claim and suit. By letter dated June 16, 1999, Attorney Boyle reported the results of his research on the issue of sudden, unforeseeable medical emergency resulting in a loss of consciousness or a seizure. In the report, Boyle cited both Massachusetts cases and cases from other jurisdictions. He concluded that if the Goldman/Tyler accident “was, in fact, caused by an unforeseeable loss of consciousness or seizure, liability in this matter would be favorable.” It was noted that “it will be incumbent on the defendant to affirmatively prove that loss of consciousness was the actual cause of the accident.”
On June 28, 1999, the plaintiff filed this action against Safety and Touchette[2] alleging violations of G.L.c. 176D and G.L.c. 93A.
On June 30, 1999, the deposition of Dr. Robin Davidson was taken. Prior to that deposition, Dr. Davidson had not been able to review Mrs. Goldman’s records due to the short notice of the deposition and the volume of records involved. Absent a full opportunity to review the medical records and history of Mrs. Goldman, he was only able to opine that there was a possibility Mrs. Goldman had suffered a stroke or other health emergency immediately prior to the accident. Boyle reported the results of the deposition and future depositions of treating physicians indicated by Rossman. Boyle notes, “it is impossible to know whether or not Mrs. Goldman suffered a stroke or other health emergency immediately prior to the accident. Until the medical record is complete, and a copy of the same provided to her treating doctors . . ., it is impossible for the issue to be fully resolved . . .” According to the report, counsel was still in the process of putting Mrs. Goldman’s entire medical history together in addition to continuing discovery in the action filed by Tyler.
Mrs. Goldman’s condition did not improve. She never regained consciousness. Her medical records were received by Safety on June 29, 1999. Mrs. Goldman died of injuries sustained in July of 1999. The records were forwarded to Dr. Davidson for his review. He did not respond until some two months later. He explained his delay in reviewing the records was due to his involvement in other litigation. Dr. Davidson advised counsel that, after a careful review of the records, there was nothing found to support a stroke or heart attack. Dr. Davison stated that the autopsy report might be helpful and agreed to review it when available. Dr. Davidson was asked to provide a written report following his review of the autopsy report. He provided that report by letter dated October 27, 1999 in which he stated: “I think that it is theoretically possible that Mrs. Goldman had suffered a problem with either a mild stroke or cardiac arrhythmia. The gross autopsy findings, however, don’t support that so that this becomes only a theoretic possibility ...” Dr. Davidson recommended a microscopic examination of Mrs. Goldman’s brain tissue might be helpful. By letter dated November 18, 1999, counsel requested additional and/or clarifying information from Dr. Davidson. By November 22, 1999, counsel for Safety recommended retaining a neuroradiologist to review Mrs. Goldman’s MRI since Dr. Davidson was unable to explain white dots noted on the MRI.
Maria Rost was appointed as Executrix of Mrs. Goldman's estate on October 20, 1999. Boyle reported a conversation he had with Mrs. Rost. Mrs. Rost was upset that the case with Tyler had not been settled. She reported having received a telephone call from Rossman in which he complained that Safety refused to settle the case even though his client was “permanently disfigured” as a result of the accident. Mrs. Rost told Boyle Mrs. Goldman was “quite distraught” about *588 a business dispute with her daughter Meg. Meg recommended her mother retire. As a result she was tired and distracted. She also reported that Mrs. Goldman was probably tired on the day of the accident since she was an active woman and she had just given up caffeine. According to the letter to Touchette dated December 10, 1999 from Boyle, this was the first time that he heard anything concerning Mrs. Goldman’s state of mind at the time of the accident. It was also information which would be helpful to the plaintiff in his action against Mrs. Goldman and “undercuts our defense that she suffered a medical emergency immediately prior to the accident.”
On December 14, 1999, Rossman deposed both Dr. Davidson and Dr. Daniel Devereaux, the trauma surgeon who attended to Mrs. Goldman at UMass Medical Center. Upon completion of the depositions, by letter to Safety’s attorney in this action, Stephen M.A. Woodworth dated December 16, 1999, Rossman repeated his prior demand made on Touchette in his May 18, 1999 letter and offered to settle both the underlying claim and the 93A/ 176D claim for the policy limits. The offer to do so expired on December 22, 1999. A copy of the letter was hand delivered to Guinan when he appeared at the insured’s deposition.
On January 19, 2000, Boyle retained Rodney H. Falk, MD to review the medical records of Mrs. Goldman. By letter dated January 31, 2000, Boyle notified Touchette that Dr. Falk did not find any evidence in the treatment records supporting the possibility that Mrs. Goldman suffered a myocardial infarction or heart attack. Records of the medical history of Mrs. Goldman were sent to complete Dr. Falk’s review. In his letter of February 2, 2000, Boyle noted that this did not affect the possibility that she suffered a cerebral infarction or stroke. Additionally, Boyle sought a review and preliminary opinion from a neuroradiologist, Richard Swartz, MD to analyze the MRIs and CT scans because Dr. Davidson had previously noted abnormalities. That report had not been received as of January 31, 2000. Boyle reported the results of Dr. Swartz’s review in his letter of February 23, 2000.
By letter dated February 3, 2000, Boyle reported that he had received and reviewed the Commerce Insurance file concerning the accident. He noted that when the plaintiff was asked by Katie Paquin, the Commerce adjuster, if Mrs. Goldman was conscious or unconscious, he responded that he was “not sure.” The plaintiff was reported to have said he did not know if Mrs. Goldman’s eyes were open but she was sitting upright behind the wheel. Paquin noted that Mrs. Goldman was wearing her seat belt. Paquin also reported that after giving his recorded statement, the plaintiff left the room with Rossman. They returned shortly thereafter and wanted to clarify something. The plaintiff then stated that immediately prior to the accident, he saw Mrs. Goldman looking straight ahead, that he had made eye contact with her and she appeared to have both hands on the wheel and to be in control of the vehicle.[3]
Boyle’s efforts were not limited to the issue of liability. He also sought discovery concerning the issue of damages. Boyle reported receiving medical records of the plaintiff in the Commerce file in his letter of February 3, 2000 as well as having received the plaintiffs answers to interrogatories and response to a request for production of documents. The documents included medical records and photographs[4] which Boyle had seen previously. The plaintiff also produced copies of his tax returns for 1995, 1996, 1997 and 1998. On February 22, 2000, the plaintiff was deposed in the underlying action. Boyle sent a report to Touchette in his letter of February 29, 2000. In the report, Boyle summarized the plaintiffs testimony concerning the accident as well as his testimony concerning his injuries, treatment and other damages. Other depositions taken in March of 2000 included the driver of the third vehicle Elio Nascimento, the witness Carl Young and Marian Rost, executrix of Mrs. Goldman’s estate. On March 28, 2000, Boyle sent Touchette a detailed report and analysis of the plaintiffs claim for damages.
By letter dated May 15, 2000, Safety offered the plaintiff the policy limit of Two Hundred and Fifty Thousand ($250,000.00) Dollars. The plaintiff accepted the offer and returned the release under cover of letter dated June 6, 2000.

Discussion

“An insurer’s duty to settle arises when ‘liability has become reasonably clear.’ G.L.c. 176D, §3(9)(f). Clegg v. Butler, [424 Mass. 413,] at 421. Liability, as the word is used in this context, ‘encompasses both fault and damages.’ Id. Conversely, insurers do not have an obligation to settle as to an insured whose liability is not reasonably clear. Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 677 (1983). Premier Ins. Co. of Mass. v. Furtado, 428 Mass. 507, 509 n. 5 (1998).” O’Leary-Alison v. Metropolitan Property & Cas. Ins. Co., 52 Mass.App.Ct. 214, 217 (2001). “Conversely, insurers do not have an obligation to settle as to an insured whose liability is not reasonably clear.” Id., citing Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 677 (1983); Premier Ins. Co. of Mass. v. Furtado, 428 Mass. 507, 509 n. 5 (1998).
In assessing a claim against an insurer, the inquiry is whether Safety “reasonably believed that its insured’s liability with respect to damages was not clear.” Id. The test for determining whether liability has become “reasonably clear” is an objective one, i.e. "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff.” Id., citing Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 956-57 (1995).
When confronted with the facts and circumstances of the head-on collision which resulted in Mrs. *589 Goldman’s death and the serious injuries suffered by the plaintiff, it was apodictic that the collision was caused by Mrs. Goldman’s vehicle having veered into the lane of oncoming traffic. That does not resolve the issue of liability. It was critical to the issue of liability for Safety to attempt to find out why Mrs. Goldman’s vehicle veered into the lane of oncoming traffic. If she did so as a result of an unforeseeable medical emergency, Safety would have a complete defense to the plaintiffs claim of negligence. See Scesny v. Winn, 51 Mass.App.Ct. 1115 (2001).
Safety’s investigation into the claim began promptly after notice of the accident was received. By November 25, 1998, Safety had characterized its liability as “unfavorable” on the basis of the physical evidence and witness statements. However, that characterization did not mean that Safety was not entitled to investigate the possibility of a sudden medical emergency. The witness observations, including the plaintiffs statement that he had eye contact with Mrs. Goldman prior to the accident, were not determinative of that issue. In fact, those circumstances demonstrated that the investigation into the possibility of a sudden medical emergency was reasonable.[5]
A major impediment to prompt investigation arose from the fact Mrs. Grossman never regained consciousness.[6] She was unable to provide any statement concerning the accident or what caused her vehicle to cross over into oncoming traffic. Safety was unable to obtain her medical records until a temporary guardian was appointed and issued an authorization for production of the records. Safety obtained the records and had them examined. One examination led to the necessity, of further examination. After Mrs. Goldman’s death in July of 1999, further delays resulted from the necessity of having an executor appointed. Once counsel was appointed to represent the insured, they researched the law relating to sudden medical emergencies and began to retain medical experts and to receive their reports.
Safety’s investigation of the plaintiffs damages was also reasonable under all of the circumstances. Neither counsel for Safety nor Touchette can be faulted for the thoroughness of their investigation in light of the circumstances of this case. Although liability did ultimately become clear when it was finally determined that the defense of sudden medical emergency was not viable, that does not mean an insurer who investigates a claim and a reasonably suggested defense does so at its peril. Investigation into both the cause of Mrs. Goldman’s veering into on-coming traffic and the scope and extent of the plaintiffs injury was warranted. The scope and duration of that investigation was reasonable.
Based upon all of the facts and circumstances, the court finds that as of June 28, 1999, the day on which this action was filed, Safety was justified in not having settled the plaintiffs claim against Mrs. Goldman because liability (both as to fault and damages) was not then reasonably clear. Ultimately, when liability did become reasonably clear, Safety offered the policy limits. The court finds that in the handling of this claim, Safety did not violate either G.L.c. 176D or G.L.c. 93A.

Order

Based upon the foregoing, the court orders that judgment enter for the defendant Safety Insurance Company.

 insurer for the Nasctmento vehicle.

 Attorney Rossman later agreed to dismiss as to Touchette personally.

 Initially Boyle summarized the plaintiffs statement to Commerce Insurance. A copy of the statement was sent to Touchette on February 21, 2000.

 Boyle noted that, although the plaintiff claimed disfigurement, the scars were not visible in the photographs.

 Plaintiffs counsel sought a prompt settlement of this matter by resorting to direct communications with the Goldman family and later with her executrix and by raising the specter of potential liability under G.L.c. 176D and G.L.c. 93A with Safety as early as May 18, 1999.

 There is some indication in the records that members of Mrs. Grossman’s family felt she was responsive. However, those instances were fleeting and communication (if any) consisted of squeezing the hand of a recognized family member.